# HERRICK

New York
Newark
Princeton

STEVEN D. FELDMAN
PARTNER
Direct Tel:  212.592.1420
Direct Fax:  212.545.2311

Email:  sfeldman@herrick.com

January 28, 2009

**VIA FACSIMILE & FEDERAL EXPRESS**

Honorable E. Thomas Boyle
United States Magistrate Judge
United States District Court
Eastern District of New York
Long Island Courthouse
100 Federal Plaza
Central Islip, New York 11722

    Re:  <u>United States v. Nicholas Cosmo</u>, 09-0066M

Dear Judge Boyle:

    We represent the defendant Nicholas Cosmo.  We write in opposition to the Government's January 27, 2009 letter to the Court seeking the detention of Mr. Cosmo without bail, and in support of the defendant's request to be released on bail pending trial.  For the reasons set forth below, we respectfully submit that the Court should release Mr. Cosmo subject to certain bail conditions which will reasonably assure the appearance of Mr. Cosmo in court and the safety of the community.

## Legal Principles

    The Bail Reform Act of 1984 "did not… signal a congressional intent to incarcerate wholesale the category of accused persons awaiting trial.  Rather, Congress was demonstrating its concern about 'a small but identifiable group of particularly dangerous defendants….'" <u>United States v. Orta</u>, 760 F.2d 887, 890 (8th Cir. 1985) (quoting S.Rep. No. 225, 98th Cong., 1st Sess. 6-7).  As Congress explained in the legislative history, "It [was] anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants." <u>Orta</u>, 760 F.2d at 890 (quoting S.Rep. No. 225, 98th Cong., 1st Sess. 12).

    Pursuant to these policy goals, Title 18, United States Code, Section 3142 "favor[s] release over pretrial detention." <u>Orta</u>, 760 F.2d at 890.  The statute directs that a "judicial officer shall order the pretrial release of the person… subject to the least restrictive [] condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community…." 18 U.S.C. § 3142(c).

HERRICK, FEINSTEIN LLP
A New York limited
liability partnership
including New York
professional corporations

2 PARK AVENUE, NEW YORK, NY 10016 • TEL 212.592.1400 • FAX 212.592.1500 • www.herrick.com

H E R R I C K

January 28, 2009
Page 2

The statute directs the court to consider, *inter alia*, (1) the nature and circumstances of the offense, including whether the offense is a crime of violence or terrorism, or involves a controlled substance or gun; (2) the weight of the evidence; (3) the history and characteristics of the defendant including family ties, length of residence in the community, community ties, criminal history, and record concerning appearance at court proceedings; (4) whether, at the time of the offense, the person was on probation, parole or other release; and (5) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

The Second Circuit has emphasized that where the Government seeks detention based on risk of flight, detention is not appropriate for the sole reasons that the charged crime is serious and the defendant faces a potentially long sentence.  "In other cases concerning risk of flight, we have required more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." United States v. Friedman, 837 F.2d 48, 50 (2d Cir. 1988).  Rather, additional factors must also be present such as use of aliases, frequently moving from place to place, skill in avoiding surveillance, and evidence of hidden assets. Friedman, 837 F.2d at 50.

Similarly, in United States v. Berger, 06-CR-130 (NGG), 2006 U.S. Dist. Lexis 55844 (E.D.N.Y. Aug. 9, 2006), Judge Garaufis reversed a detention order based on risk of flight for a defendant charged with racketeering, trafficking in false identification documents, and conspiracy to sell stolen property.  The Court emphasized that the defendant was 52 years old, had lived in Brooklyn for the past 43 years, his wife and two young children lived in Brooklyn, as did his elderly mother, he had extensive business ties to the New York area, the Government had his passport, and no evidence suggested significant ties in foreign countries to which he might flee.  2006 U.S. Dist. Lexis 55844, at *10.  In addition, although Berger had a "fairly extensive prior criminal history," he had consistently appeared for court, and previously voluntarily surrendered to serve a 41 month sentence for a prior conviction. Id.  Based on these facts, Judge Garaufis concluded that the Government had not met its burden to prove risk of flight by a preponderance of the evidence.  2006 U.S. Dist. Lexis 55844, at *11.

We respectfully submit that after considering the requisite factors and the relevant case law, this is a case where the defendant should be released on bail.

HERRICK

January 28, 2009
Page 3

## **Discussion**

In its submission, the Government argues that Mr. Cosmo is both a danger to the community and risk of flight.  Taking these arguments in turn, it is clear that the Government has not met its burden on either issue.

A.   *The Government has Failed to Show By Clear and Convincing Evidence that Mr. Cosmo Poses a Danger to the Safety of Any Person or to the Community.*

In order to detain a defendant pretrial based on danger to the community, the Government must provide the Court with "clear and convincing evidence" to support such a finding.  Here, the Government's submission identifies only three facts in support of its position: (i) that the alleged size and scope of the scheme was large; (ii) that it was executed only a few years after Mr. Cosmo's prior conviction; and (iii) that Mr. Cosmo continued to operate Agape after he was aware of the "possibility" of a criminal investigation.  (Gov't Ltr. at 7.)  The Government makes no effort to explain how these three items show that any person or the community in general will be endangered in the future by Mr. Cosmo's release on bail pending the resolution of this case.  Taken separately or in total, these facts in no way show by clear and convincing evidence "that no condition or combination of conditions will reasonably assure the safety of any other person and the community."  18 U.S.C. § 3142(f)(2)(B).

Here, the community is undoubtedly aware of the charges against Mr. Cosmo. Over the last several days, through the distribution of Government press releases, the holding of press conferences, and the advance notification to the press of the place and time of Mr. Cosmo's voluntary surrender, the fact that Mr. Cosmo has been charged with mail fraud has been broadcast throughout the community.  Mr. Cosmo's picture has appeared on television and in the paper.  There is simply no basis to argue that there is any likelihood that anyone will be defrauded by Mr. Cosmo while this case is pending.

In addition, the Government has seized and frozen the Agape and AMA bank accounts, seized the books and records, and shut down the companies.  If released on bail, Mr. Cosmo is powerless to act with respect to Agape World and AMA.  Regardless of the size of the purported fraud, the timing of the purported fraud, and the fact that Mr. Cosmo continued to operate when he was aware of the possibility of a criminal investigation, it is simply beyond the pale of reasonableness to suggest that Mr. Cosmo now still poses a serious danger to the safety of any person or the community in general.  The Government therefore has failed to show by clear and convincing evidence that Mr. Cosmo is a danger to the community.

Herrick

January 28, 2009
Page 4

B.      *With Appropriate Bail Conditions, the Court Can be Assured that Mr. Cosmo Will
        Appear in Court Pending the Resolution of this Matter.*

        Considering the requisite factors, Nicholas Cosmo does not pose a risk of flight
such that no bail conditions can be set.  Mr. Cosmo has strong and extensive ties to the
community.  A lifelong resident of Long Island, Mr. Cosmo, who is 37 years old, lives locally
with his wife in a home owned by the family, and has three children, including a two year old
and six month old baby.  His sister and brother-in-law live nearby with their family, in a house
they own, and Mr. Cosmo's mother and father also live in the community in their own home.
Over his lifetime, Mr. Cosmo has made an extensive network of friends, and is deeply involved
with the community, most notably through a children's baseball league he operates.

        Mr. Cosmo has no foreign ties.  Mr. Cosmo does not have a history of foreign
travel, has not lived overseas, does not own an overseas home or business, and has no overseas
bank accounts.  While the Government has described in the criminal complaint extensive
analysis of years of bank records and transactions, it has not alleged any overseas wire transfers
or banking transactions.  In addition, following his arrest, Mr. Cosmo's wife, at his direction,
surrendered his passport to his attorneys to provide to the Government.

        The statute directs the Court to consider the individual's criminal history, record
concerning appearance at court proceedings, and whether, at the time of the offense, the person
was on probation, parole or other release.  These factors also favor Mr. Cosmo's release on bail.
Mr. Cosmo has one prior conviction for fraud carried out when Mr. Cosmo was a 25 year old
stock broker in 1997.  He pleaded guilty, was sentenced to 21 months in prison, and completed
his period of supervised release without any issue.  Notably, there is no allegation that Mr.
Cosmo failed to appear when required, jumped bail, or ever had a bench warrant issued to
compel his appearance.  Further, although the Government appears to argue that Mr. Cosmo's
business was a fraudulent scheme from the moment he accepted his very first investor check,
even the Government agrees that this occured *after* the time that Mr. Cosmo's supervised release
had terminated without incident in August 2003.

        The Court is also required to consider the nature and circumstances of the offense,
including whether the offense is a crime of violence or terrorism, or involves a controlled
substance or gun.  While there is no issue of violence or drugs in this case, as the Court
emphasized at Tuesday's presentment, there is certainly an issue related to the magnitude of the
losses alleged by the Government.  In the criminal complaint, the Government states that over
$370 million was raised from investors over a three year period.  (Compl. ¶ 5.)  Of that, the
Government reports that approximately $80 million was lost in commodities trading and more
than $55 million was paid to account representatives.  (Compl. ¶ 13.)

        However, the Government's analysis makes no effort to quantify the money
returned to investors (whether described as interest or principal).  Based on our review of
company records, approximately $74,027,785 was returned to investors in the year 2008.

H E R R I C K

January 28, 2009
Page 5

Approximately $39,896,065 was returned to investors in 2007.   Although we have not yet reviewed the records for 2006, we understand that millions more dollars were returned to investors in 2006 and prior years.[1]

The Government also states that based on its analysis of bank records, less than $10 million of the money raised was forwarded to borrowers as loans.  (Compl. ¶ 5.)  However, the business did not generally forward the loans directly to borrowers.  Rather, loan funds were generally forwarded to law firms and title agents to be held pending the completion of the loan deals.  Once the loans were completed, the money was disbursed to the borrowers.  Notably, the Government's complaint make no effort to quantify funds transferred to law firms and title agencies.  Similarly, while the Government has labeled every aspect of the business a fraud, it has apparently failed to contact the company's corporate lawyers to obtain copies of the loan deal books, the title agencies who assisted in the deals, or even search the public property records to locate the documents securing the company's interest when it made loans.

While we lack access to the company's records because the Government seized them, we believe the records will show some approximately 17 outstanding bridge loans totaling approximately $25 million.[2]   Unfortunately, because of the current real estate climate, approximately 14 of the 17 loans are now non-performing.  In addition, through AMA, we believe there are secured business loans totaling approximately $4 million to $6 million.[3]  Those loans have been performing without any problems.  Taken all together, these calculations reduce the Government's claim of losses from approximately $370 million to approximately $90 million.  If an amount comparable to the approximately $39 million returned to investors in 2007 was returned in 2006, the loss amount would be reduced to approximately $51 million.  Not included in these calculations are any payments for business expenses over the years including money paid to professionals such as attorneys and accountants, money paid for rent and equipment to run the companies, or other funds spent to run a business.  While $50 million is certainly a huge amount of money, it is very different claiming that $370 million is unaccounted for as opposed to $50 million.  Moreover, the quick process of showing the errors in the Government's figures -- completed over a short 24-hour period -- shows it is likely that when the Government analyzes the documents it seized, it is likely to find that more money is not missing.

One more example of errors in the Government's complaint is useful to bring to the Court's attention.  At paragraph 28 of the complaint, the Government outlines part of a transaction which it claims demonstrates the fraudulent nature of the business.   In that transaction, a company called Golden (labeled by the Government as Company A) is reported to

---

[1] The Government seized the companies' records when it executed search warrants on Monday, January 26, and has the ability by examining those records to inform the Court and the parties of the amount returned to investors in 2006 and prior years.

[2] The companies who received the outstanding loans are Clemson Grand, Northway, X-Arena, Baha, Caroline Park, Sparanza, 508 W. Partners, Orchard Street, Rolling Lyons, Bridgeport Partners, Mastercraft Masonry, United Steel, Adamis Pharmaceuticals, Spiral Frog, Jefferson Street and Carriage House.

[3] Perlmac received such a loan which it has been repaying as required.

January 28, 2009
Page 6

have repaid a loan totaling $545,000 but investors in turn received checks totaling $5.2 million. In fact, the complete story is that Golden had committed to two loans -- one for approximately $500,000 and a second for approximately $4.5 million. The company raised $5 million from investors for these two loans (notably, the Government does not state in the complaint how much was raised from investors for the Company A transaction). After Golden repaid the first loan, it determined not to take the second part of the loan for $4.5 million. Agape in turn returned to the investors $5 million plus interest. Because the Government made no effort to trace how much money was raised from investors for the Golden loans or explain that Golden backed out of the second part of the transaction after initially committing to it, paragraph 28 is misleading.[4]

Taking all of these factors together, the appropriate conclusion is that Mr. Cosmo should be freed on bail. As set forth above, Mr. Cosmo has incredibly strong family and community ties. He has no foreign ties. He voluntarily surrendered to authorities when informed that there was a warrant for his arrest, and has surrendered his passport to his attorneys. In addition, in his prior criminal proceeding, Mr. Cosmo always appeared when required.

Although the current case is very serious and Mr. Cosmo faces the possibility of serious jail time, the Second Circuit "require[s] more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." United States v. Friedman, 837 F.2d 48, 50 (2d Cir. 1988). Rather, this case is on "all fours" with Judge Garaufis's decision in United States v. Berger, 06-CR-130 (NGG), 2006 U.S. Dist. Lexis 55844 (E.D.N.Y. Aug. 9, 2006). As in Berger, Mr. Cosmo has lived in this community for his entire life, his wife and young children live in the community, as do his elderly parents, he has extensive ties to the area, the Government will have his passport, no evidence suggests significant ties to foreign countries, and he previously consistently appeared for court and served his prior sentence without incident. This Court should similarly conclude as in Berger that the Government has not met its burden to prove risk of flight by a preponderance of the evidence. Rather, as recommended by Pre-Trial Services in its report, this Court should set a bail package for Mr. Cosmo.

**Proposed Bail Package**

Mr. Cosmo proposes the following bail package for the Court's consideration: a bail bond in the amount of $750,000 secured by the signatures of four family members (Mr. Cosmo's wife, father, sister and brother-in-law) or other financially responsible individuals. The family is also prepared to secure the bond with one or more of the family member's homes as the

---

[4] The Government has also attempted to "dirty up" Mr. Cosmo by relating to the Court unfounded allegations about Mr. Cosmo using two social security numbers. As we informed the Court, Mr. Cosmo and his father share the same name -- a fact which the Government could easily confirm. Similarly, the Government claims that Mr. Cosmo misled a Probation Officer (at some unidentified time) about the Agape used car advertising internet business. (Gov't Ltr. at 6.) In fact, a quick search of the Internet Archive web site shows the existence of the Agape used car advertising web site www.AgapeCars.com in 2002 and 2003.

Court deems appropriate. In addition, Mr. Cosmo should be placed on strict pre-trial release and his travel should be limited to the Southern and Eastern Districts of New York. We request that Mr. Cosmo be released upon the signatures of two family members, and that he be given one week to comply with the remaining bail conditions.

**Conclusion**

As set forth above, we respectfully submit that the relevant facts and law strongly urge Mr. Cosmo's release on bail. There are conditions present that will reasonably assure Mr. Cosmo's appearance as required for court, and the safety of the community. Accordingly, we respectfully request that Mr. Cosmo be released on bail as soon as possible.

Respectfully submitted,

Steven D. Feldman

cc: AUSA Grace Cucchissi (by fax)